Okay. Next case is the Northrop case. That is Northrop v. AxisReinsurance, number 19-1949. You may proceed, Counsel. May it please the Court? Tim West, Counsel for Appellate AxisReinsuranceCompany. And I'd like to request five minutes for a vote. That'll be granted. Thank you. The fundamental issue before the Court is whether the claims asserted in the Marshall class action filed during the 2016-2017 policy period are the same or related to the claims asserted in the Grayback class action filed during the 2006-2007 policy period. Now, during the 2006-2007 policy period, Axis is an excess insurer, but it's the working layer because the underlying national union and CNA layers have been exhausted. We're pretty familiar with that. Okay, good. So, Nick, as a result of Judge Barron's order, Axis has essentially exhausted its policy limits by contributing towards the defense expenses incurred in the Marshall litigation and committing to fund the settlement of the Marshall litigation. Yeah, that's something of interest to us, how that all plays in this case. Well, what happened is Axis did step up to the plate and paid, and that's why we're here today, because Axis contends that the payments it made should have been made by national union. So this is a live controversy still? Very much. Okay. Yes. As you know, the national union 2016-2017 policy period is a duty to defend policy. So under general duty to defend principles, if any claim in Marshall does not relate back to Grayback, then under those principles, national union has a duty to defend the entire claim. So you want us to split it all apart and say it could be part of it. Some may be related, some may not. You're not responsible for the unrelated part? Correct. Okay. Yes. Everyone agrees this is California and Virginia law. No one seems to be saying those two laws are relevantly different as far as I can tell. So the question is, what does the word related mean? Yes. Now, there's some authorities cited that suggest related, you know, dictionaries is a broad term. The authorities seem to suggest that it could be either a causal or a logical connection between the two. Do you dispute that? I don't dispute that broad principle. Okay. Then why do you dispute – let's get granular here. There are – can we make T-shirts out of that? Let's get granular? Just kidding. In Grayback, we have a claim of fee capture and a claim of excessive fees, and the excessive fees paid out specifically involving the active market fund as well as some others. Okay? Now, you want to say that the Marshall claims are not related. Are you standing up here contesting that the internal fee capture between the two, that that piece of it isn't related? Yes. Okay. Why – you say the plaintiffs are different, the board is different, et cetera. Can we at least get agreement on what the ground rules are here? There's a lot of discussion about these statements of litigation, the judge saying this. There's a lot that seems like distractions. Shouldn't we just take the four corners of the complaints and just put them up against each other and then compare whether the causes pled in the second one are the same as the causes pled in the third? We're usually using language of complaints in deciding these duty-to-defend issues anyway. Isn't that the cleanest way to decide what's related? I agree with you. Okay. So we can set aside those other distractions and statements. What makes Northrop's own fee capture not related to the fee capture in the first one? I agree there are several other claims we have to go through, but let's start with that one. Okay. At pages five through eight of our reply brief, we detail the critical distinctions between the excessive fees claims as alleged in Grayback and the excessive fees claims as alleged in Marshall. Okay. And I can go through those again if you would like. What are the key ones you want to hang your hat on? The key ones are the excessive administrative fee claims in Marshall pertain primarily to the failure to follow the advice of Gilder and Associates, the consultants. Then there are allegations concerning the investment plans. There are allegations on the investment plans that the – also allegations on investment plans of kickbacks and pay-for-play. There are – Okay. There are some pay-for-play allegations thrown in there, but you brief oversimplifies in saying this is really just a pay-for-play allegation. That's like a duty of loyalty, but there's some basic you just overspent on fees claims in Grayback too that aren't really about you got a kickback from this. So why aren't those similar to what's in Marshall? Well, but in Grayback there's also the allegation on the fees that the – let me find it here – that as the plan – that the Norfolk personnel were threatened with the loss of their jobs if they outsourced administrative functions. Now, so you have different lawful acts alleged in Grayback about the administrative fees, but you also have not only the different lawful acts because Marshall basically said you didn't make any – you didn't obtain a competitive bill at all for consultants. That's completely different than saying you didn't follow the advice of a consultant, which you have in Grayback. Also, in Marshall, the allegation is you didn't follow the terms of the administrative services agreement. That allegation doesn't appear in Grayback. But the acts, not only are the acts different, they're different in kind because there's a lot of nefarious behavior alleged in Grayback that's not alleged in Marshall. Marshall's just alleging technical violations. You didn't do this. You didn't do that. In Grayback, they allege that you didn't follow the advice of the consultant. You did have. You were engaging. So they whittled down what had been pled in Grayback, and they're pleading some subset of it in Marshall. That's not enough to say that what is pled in Marshall isn't related to the earlier ones. I don't think dropping some things that are unpersuasive necessarily means that what remains isn't related. Well, the question is, it gets back to the fundamental issues related. And it's whether there's any substantial overlap, whether they're inexplicably bound. And in Grayback and Marshall, as we pointed out, the claims in Marshall are not only different, but once again, they're different in kind. The allegations in Marshall, there are no allegations in Marshall accusing the defendants in Marshall of the same type of behavior that's being alleged in Grayback. But they're both fiduciary claims with respect to ERISA, right? In both cases? Yes. Which is. It's like check, right? The check, right. Case which we cited both of those cases, the original Newman class action, the second amendment complaint, all involved violations of the TCPA. There was the same allegations. I mean, the same fundamental violation being alleged. But the court, Judge Sweet, held in that case that you had different acts at different times with different people. And they're a different group of litigants. And therefore, in the context of class actions. Is it a different group of litigants here? Yes. Because of the class periods. It's completely different. The actual plaintiffs involved the same group of people, right? No, you can't say that because it's two different groups. There's two different class periods separated by six. There's a 16-month gap. And when you look at class certification, like the definition of a class, a class has to be defined as the. Generally, in this, it would be all persons who were or beneficiaries of the relevant plans. And by the way, there are two plans at issue in Grayback. There aren't two plans at issue in Marshall. But one of the two is the same, right? Yes, that's correct. OK, so. Go ahead, go ahead. Let me just finish this one. But in terms of class certification, it would be all persons who are or were or are beneficiaries of the plans during the class period. Who were affected by the conduct occurring during the class period. It does make a difference that there's different class periods and different class members. You could have class members in Rayback who may not even be around at the time of the Marshall class action. You also the conduct. It has to be the conduct has to occur during a certain class period. The conduct that occurred during the Marshall class period is completely different. And also there are different injuries. Unless it's related, right? It doesn't have to be identical. No, but if you look at the case, if you track the case law on related acts, the courts do go through this analysis. And for example. Well, Judge Bevis has a question. Related, related doesn't mean identical. No one's claiming it means identical. So I don't think a few plaintiffs coming in and out, a few people moving on the board is going to change things. You do have this question we have to wrestle with. This is it's a follow on. It's a later time period. Is that enough of a continuation? But if we don't buy your well, let's look at the they didn't listen to the consultant. They didn't hire the consultant. I would have thought your best argument is this like Hewitt record keeping fees claim. Why don't you tell us? Is there something specific about that that is fundamentally different from the investment advice claims that were in Greyback? Well, and we we do address that. The U.S. and U.S. and U.S. financial engines claims. You wouldn't financial engines are not even mentioned in the Greyback class actions. And in fact, if you look at the complaint of Marshall, it says the conduct occurred during starting in 2010. And there's an allegation in Marshall that financial engines was taking back fees to you. And it's alleged in Marshall that that didn't occur until 2012. So there are no allegations in Greyback about you or financial engines and the emerging markets, emerging markets claims completely different because that had to do. The theory in Marshall is that they earned excessive fee. The fees were excessive because they didn't switch the emerging markets fund from active to passive management. What were active management to get higher fees? Well, I see your time is up. Counsel, you do have some some more time. But let me ask you one thing before you sit down. Just to be very clear, because these these conflict of laws issues can be confounding. You're saying that I wonder about Delaware law because it's mentioned at times in your brief. You're not saying that that that applies here. We're not. OK, great. And is there basically no conflict of laws in the in the Virginia between Virginia and California as as as applies to this case? Certainly not on duty to defend. And what's interesting, you'll see the case law in this area. It tends to be national in terms of what's related or interrelated to that. So you're going to see by definition you're going to see cases from. But is there any conflict in your view as applies to this case? On that analysis? I'm asking the question. No, I don't. Is there any conflict of laws in this case? In the laws that affects the outcome of this case. OK, thank you. Great. Thank you. May it please the court. Good morning. Barry Fleischman for Northrop. Your Honor, let me get directly to the conflict issue. Maybe it's not one. I hope it's not. We don't believe there is a conflict issue. We raise Delaware in our briefing both to the district court. We mentioned it in our briefing to this court. Delaware has a fundamentally identical test for relatedness. And that's in the United West Labs case. You don't disagree with your friend on the other side that California and Virginia law apply. But this is all basically the same law of what related means. With one nuance. OK. We believe Delaware law would apply. But we don't believe that there's a significant difference in the relatedness standards under any of those. Did you raise that in the district court? We noted it to the district court in a footnote that said we did not believe that there was any significant difference in the standards that would result in a different outcome. But did you say Delaware law applies? We did not specifically say Delaware law applies. Are you saying whether we apply Delaware, California, or Virginia law, we get to the same place? Correct. OK. Do you agree with your friend on the other side that the four corners rule is the correct way to approach this? There's been a lot of hand-waving about statements made in litigation and judges, et cetera. Not sure I see that any of that matters. But if it did matter, is there any reason why we should look at it? Four corners of the complaint controls. OK. And the Delaware Supreme Court case in ATTV Faraday says that each cause of action within a complaint can be a separate claim. And basically here, which you've discussed already with my colleague, there are three basic claims in Marshall. There's the prohibited transactions excessive fees claim. There's the third-party administrator Hewitt financial engines claim. And then there's the claim that the wrong investment strategy was used in the EMF fund. Those are the three claims in Marshall. If any of those three claims is related to a claim in Grayback, then Axis has a duty. Right. You guys are happy with that. Now, we'll have to hear from National as to whether all of them are related. But what's the best case for saying at least one of them is related for you? Prohibited transactions, there's no question that that's related. Same activity, contiguous time period, same alleged wrongful act. Basically, both Marshall and Grayback are saying that there was the plan used Northrop. The allegation is the plan used Northrop to perform plan services and they charged excessive fees for it. Exact same claim, repetitious in the two different acts. I think the I think the Hewitt fees claim is, you know, maybe more contestable. It may not matter for your purposes. I'm going to ask your friend for National this. But what's the argument that the Hewitt claim is still related? Because their argument, especially in the brief, was the earlier claims are about hiring investment advice. And this one is about record keeping investment management in Grayback. And now we have record keeping and at most investment advice in Hewitt. So are those are those related? Your honors, we don't think those two claims are related. For purposes of accesses obligation, all we need is one related and then they have a full and complete duty to defend. They're important to go to the contract on that just for one second. The contract says that there's a separate defense agreement in the National Union primary that's different from the duty to indemnify. And the two cases on point, Braden and Julio and Sons, say that when the policy has a separate defense agreement, the duty to advance is treated as if it was a duty to defend. And that makes sense because there are other there are two other provisions within that defense agreement. One, there is an immediate duty to pay. You have to pay within 90 days. Number two, you have to pay before the underlying case is determined. So it wouldn't make sense other than it was a duty to defend to have those other two provisions. So all we need is prohibited transactions relatedness. Access has a full obligation to pay the defense costs. We have an interest, however, that this court gets the correct result as to the other two claims. Hewitt was not raised in Grayback. There's no claim that there was a third-party administrator that was overpaid. In fact, the claim in Grayback is that Northrop internally did all the services and didn't use a third-party administrator. It's almost the opposite. That's not related. It doesn't matter what level of generality we look at it. You know, your friend for access, Mr. West, wants us to look at the very particular, this consultant, this accusation. Your friend for National Union wants us to say, hey, you know, either these are all ERISA fiduciary. I'm not sure that works because this is just an ERISA fiduciary kind of claim. But more specifically, this is about squandering the money of planned participants to whom there's a fiduciary duty by not keeping a lid on fees and costs. And that's a lot more specific than the universe of general ERISA claims that are out there. So how do we figure out if level of generality? You're taking a low level, but the word related is a pretty broad word. Doesn't the case law suggest we should take a higher level approach? No, Your Honor, I don't believe so. I believe the case law says that you focus on the wrongful act. That's the focus. How do we define the wrongful act? The wrongful act is the activity, specific activity alleged. In these cases, the Eureka case, the home insurance case, those are the cases we think you should be looking at. Eureka, home insurance. Those are very fact-specific. And they say that if they are disparate acts, if they are different acts, if they have a different decision-making factor to them, then they're not related. The other cases that hold to relatedness, if you look at the acts at granular level, those cases all involved repetition of the same act. It's the same wrongful act. It's the same complaint of the plaintiffs that something has happened over and over again. That's not the case either with respect to the third-party administrators or with respect to the EMF claim. The EMF claim in Marshall is you used the wrong investment strategy. Should have been passive, you did active. The EMF claim in Graybeck is you didn't get the right managers. And the reason you didn't get the right managers is because you got a kickback. Those are completely different claims. So we would say we look at it at that level. But we can also look at it at the level that you're paying too much for EMF, and there are a lot of EMF funds that charge much less. Looked at that way, they're related. You get the same kind of fund, same kind of harm, and maybe the motivation of the way it was done was a little bit different, but you're squinting pretty hard to say the two EMF claims are different. Your Honor, I would ask that you take a close look at the Eureka Ninth Circuit case and that you look at the financial management Ninth Circuit case. Because those cases say that you don't look at the 10,000-foot level. You look at the granular level as to what the act is. And if they are different wrongful acts, if they're disparate, then they're unrelated. Your Honor, I know, can I have one sentence? I know I'm over time. Go ahead. You can have one sentence. I have a question anyway. Okay. As between the two insurance companies, it has to be crystal clear that Northrop gets its defense costs, and if there is any contribution between the carriers, that doesn't involve Northrop. Right. My question is this. Your friend across the way there talked about the Marshall Settlement. Do you have a different view as to mootness here? Slightly different answer. Axis started paying the Marshall defense costs after Judge Brand said you ordered to pay them. I mean, Judge Brand came out with his decision, then Axis started paying, and they're paying under a reservation if this court says something different than they're entitled to make another claim on the money. So it is not a moot case. Okay. Thank you. Thank you, Your Honors. May it please the Court, my name is Sean Mahoney, and I represent the Appellee National Union Fire Insurance Company of Pittsburgh, VA. The district court in this case correctly determined that Marshall is permanently parked in Northrop's 2006 coverage tower because Marshall and Graybeck are premised upon an alleged continuous single scheme by Northrop plan administrators to cause the savings plans to overpay Northrop and others because of a series of interrelated poor investment and administrative decisions. I'd like to pick up on a point that Your Honors brought up with Mr. Fleischman just now about exactly how related these claims have to be, and I think that in this case the correct answer is that they are related because it is the wrongful acts that have to be related. The wrongful acts here are the interrelated poor investment and administrative decisions that cause these plans to overpay. I don't think it makes a difference that either there were different parties involved or different members of the committees, or that the way that they caused the funds to pay more than they should have was because of an investment strategy or because you didn't outbid the services to others. It's all the same. And I think that, frankly, that's comparable to the attorney in Bay Cities who in a number of ways caused his client not to be able to recover the funds. One way was because he didn't file mechanics, he didn't file a stop notice for the work that had to be done for that construction project and then didn't follow up on that months later. I don't think it matters that you can have an interrelated series of wrongful acts even if every bad act here is not exactly identical. The law does not require that both cases have to be identical in every respect. The standard is simply logically or causally related or that they substantially overlap. Do you agree with your friend on the other side about both the reading of and the weight of Eureka and financial management and home insurance? Do you think they're misreading them, or do you think Bay Cities is just the better precedent to follow? Your Honor, I think Bay Cities is the better precedent, and I don't think Eureka applies. Eureka involved a series of 200 unrelated borrowers and what was called an aggressive loan policy by the alleged perpetrators of that scheme. That's much more general. That's from a 50,000-foot level. That's not the same as a much more discreet class of persons who were harmed in the same way by the same planned administrators in this case. Everybody in the class in Graybeck and in Marshall, they're all Northrop Grumman employees. They're all participants in these plans. I also don't think as a sidebar it was raised that whether there are two plans at issue in Graybeck and one in Marshall. Let's grant you that. Let's grant that it doesn't matter the little bit of movement in and out of the plaintiff class and some different board members, and it's all the same plan. Let's grant you that some of the claims in Marshall are a subset of Graybeck. That's not disqualifying. I think the harder things for you are, first of all, I want to hear about this Marshall being a time period that follows on Graybeck rather than a Bay City situation where it's all part of one representation around the same time. And number two, I think the Hewitt claim is the hardest one for your side because the Graybeck allegations are allegations that they're charging excessive investment fees, but Hewitt is the first time we're getting this specifically record-keeping claim and investment advice claim. So you can take those in either order, but I want to hear you address both of them. Certainly. Let's take the time period first. The time period difference between the class period in Marshall and Graybeck is immaterial to the outcome in this case because it does not matter that there can be some intermittent space between wrongful acts. The standard does not require that wrongful acts have to occur continuously every single day during the period at issue. In fact, it's actually the period between the class periods when compared to the length of the Graybeck class period and the length of the Marshall class period is really not that long, and it doesn't mean that there wasn't a continuous single scheme by the same plan administrators to cause these plans to overpay. So I don't think it makes a difference that there was a little bit of a gap between one period and the other. I'd also point out that whatever the plaintiff's decision in Marshall, whatever the plaintiff's lawyer's decision was to start the class period there, might have been based on other things like legal reasons, statute of limitations reasons. That doesn't mean necessarily that the wrongful acts complained of in the Marshall class period are somehow not related to the wrongful acts in Graybeck. To Your Honor's second question, which is the Hewitt claim, an allegation that in Marshall that the recordkeeping fees were excessive and that the plan administrators didn't take advice or didn't seek advice from other investment managers, I think at the end of the day, number one, the allegation is that it caused the plans to overpay, and I think the allegation was that they didn't hire other investment managers who might have told them that this plan is paying too much and you should keep a lid on all these expenses. I think that's related enough. I think that's logically and causally related, and that does mean that the allegations in both actions overlap. Can we read anything into the fact that it was the same plaintiff's firm, same judge, when the judge didn't expand the window the second the Marshall litigation began? Absolutely. I think that that's very telling in this case, that the Graybeck plaintiffs first, and by the same law firm, representing the same kind of participants in the class, first sought to stuff the Marshall allegations, or the time period at least, into Graybeck. Once they were denied that request, only three months later did they file the Marshall action. I think there's a very good argument on the record in this case that the only reason Marshall was filed It was assigned to the same district court judge. That's absolutely correct. Related case rule out there. Yes, that's absolutely correct, and it's the same district court judge that later on, when ruling on a motion to disqualify a defense expert who was an attorney in Graybeck, stated on the record that Marshall is substantially related to Graybeck. And in fact, everybody except for Axis in this case agrees that Marshall is related to Graybeck. The plaintiff's law firm in both actions stated that in the Marshall complaint. Northrop argued that in the district court and argues it again here. Just argued it minutes ago. And we agree. That raises actually another point that I think what Axis wants to do here, the relief that it wants, would upset the bargain that Northrop and National Union struck twice in this case. All right. So go ahead and make that point, and then I have a question about it. Certainly, Your Honor. The point I wish to make is this. In 2006, Northrop and National Union agreed in the 2006 policy that any subsequent claims that are based on or arise out of the same or related wrongful acts as a prior claim would implicate the 2006 coverage tower. They agreed to that again in the 2016 policy year, as evidenced by the prior notice exclusion in that policy and the relation back provision here. If that bargain benefits both Northrop and National Union, for Northrop it means that they have an expectation that only one self-insured retention will apply to claims based upon related wrongful acts. Here, that's $2.5 million. There is also a benefit to National Union that only one limit of liability will apply to claims based upon the same or wrongful acts. So what Axis seeks to do here is upset that bargain, even though it's a stranger to both of those contracts. If you reverse the district court's judgment in this case, that's exactly what would happen here. That also means that Axis has no rights against National Union, based on the district court's judgment, to recoup anything later. Did you have a question? I do. I'm keeping you past time. With my colleague's indulgence, I have a couple of things to clean up. One of them is, so let's talk about how the tower works. When we're talking about insured versus primary insurer, we apply contra preferentum. We read the policy against it. Does that mean that to make sure all the policies keep interlocking in the same way consistently across time, we're also going to apply contra preferentum against the higher level insurer in favor of the lower level? So each of these policies, even when it's two insurers disputing whether it's related or not, we're still going to apply contra preferentum. How is that going to work to ensure that these stacks are all being interpreted the same way and ensure continuity of coverage over time? I think that because Axis is not a party to either one of those contracts, it doesn't have the benefit. It was neither the drafter nor negotiated either one of those policies. I think Axis would be bound by the plain and unambiguous language of both of these policies. Right, but my point is your policy with Northrop would be construed in favor of Northrop and against you under contra preferentum. In this case, Northrop is a sophisticated defense contractor. This is not the consumer case where that doctrine may apply. Northrop was represented by a sophisticated broker when it negotiated both of these policies. So I think it would be in that sense, although I don't think it's relevant to this case, but I think in that sense it would be entitled to less deference than contra preferentum would apply in other cases. But here I think it's moved because Northrop agrees with us. Northrop agrees that I don't think the panel needs to reach that question. However, what I do think for purposes of Axis's attempt or the suggestion in the briefing, at least, that Axis might have some revenue against the National Union after it advances all these defense costs, we would disagree with that. Okay, and if I could just clear the ground. Your brief agreed that Virginia and California law apply. Absolutely, Your Honor. And do you disagree with your colleagues that even though maybe it's Delaware, maybe California, Virginia, that all these laws are going to be basically the same for purposes of relatedness so we don't have to do a conflicts of laws analysis here? Yes, I would agree. Okay, and then finally on the four corners rule, do you think we can just put the two complaints up against each other and compare them? Is there any reason we need to go beyond the four corners or legal authority that says we should? I think you can compare the complaints. I mean, the only other thing beyond that is other than the admissions by the parties and what they've argued here and what positions they've taken with respect to this case, but I would agree that the complaints govern here for purposes of making that comparison. And I would, if I may, just leave the panel with one final thought. I think that in this case, Graybeck and Marshall are sibling family cases. I think that siblings in a family may not be identical in every respect and may have been born at different times, but their DNA substantially overlaps here. I think that's exactly how we would view Graybeck and Marshall, and that's why they are related, and the law requires that. So I would respectfully request that the panel affirm the well-reasoned judgment of the district court. Thank you. Thank you, counsel. And we'll hear from Mr. West. Thank you. Perhaps they're like siblings, but I don't think they have the same parents, so that's our distinction. I'm just going to quickly turn to some of his comments, and I hate to get back to why Judge Baratt ruled or didn't rule, but if a continuous single scheme is not alleged, there's no continuous single scheme allegation in Marshall, but if it were a continuous single scheme, then Judge Baratt could have granted Northwest motion to dismiss on the basis that the three-year statute limitations applied. Judge Baratt did not do that. If it were truly related in the substantive sense, we wouldn't even have Marshall. Judge Baratt could have granted the motion dismissed based on three-year statute. In terms of the bargain, there is a bargain here, and the National Union wants to avoid its duty to defend under the 2016-2017 policy. That's a bargain it doesn't want to focus on. If I may go back to the all-important relatedness issue, all that we ask is that the court follow the relevant case authorities. I think a lot depends on whether you follow a 30,000-foot view or a lower view. That's, in a sense, what it gets down to. Why should we not follow Bay Cities? Bay Cities isn't remotely on point. That's a case involving a single client and one lawyer that committed two acts of malpractice that led to a single injury. In fact, a lot of the Bay Cities court's analysis-related acts, it's just different. Obviously, factually, it's not the same, but analytically, why don't we follow that? It's just overly broad and doesn't apply in this context because it is a fact-specific inquiry, and I think it does make a huge difference that we're talking about two different class actions. I think the check-right distinction is really important. But going back to, like, for example, in Eureka North River v. Huff Okada, those cases involve the overarching 30,000-foot allegation. Well, they're related because all these cases involve aggressive loan policies. But in Eureka, the court held, well, wait a minute. There were numerous intervening business decisions that took place after the aggressive loan policy was initiated that required the existence of independent business judgment. It's the same thing we have here. We have intervening business decisions that require the existence of independent business judgments during two separate class periods. In North River, you have the same situation. The overarching big 30,000-foot allegation was aggressive loan policy. The court in North River said, well, wait. You have different borrowers at separate times for different purposes with different collateral. Okada, the court said, these are distinct and dissimilar business decisions. We're talking about decisions here in this case. It's not like a misrepresentations and omissions case where somebody just worked something out at large to the world. These are fiduciary duty claims that involve separate business decisions. The financial management advisors, that case, the 30,000-foot allegation was, oh, these cases involve misrepresentations with respect to the sale of collateral bond obligations. But the court said these are completely different, that the advice was provided at separate meetings on separate dates and the advice was given to separate clients with distinct goals and two separate losses. And there's more distinctions than just that. Like the Citrix, the one group, their representations were, I believe, oral representations, made specifically verbally. The representations made to Steinman were in documents. So the court did draw these, make these distinctions. So when you go through these cases, Ambassador, Eureka, North River, Okada, financial management advisors, check rights, you'll see the court did make these distinctions and there are not minute granular differences at all. There are the types of distinctions that you have to make. Do we need more counsel? I'm done. All right. Thank you. Thank you very much. We'll take the case under advisement. We want to thank counsel for their excellent briefing and oral argument today. And if counsel are amenable, we'd like to greet you at sidebar in a more personal way and we'll go off the record. Thank you.